The 4th District Appellate Court of the State of Illinois has now convened. The Honorable Thomas M. Harris presiding. All right. Good morning. The first case this morning is number 4-23-0787, in raid the estate of Janice Meyer. Counsel for the appellant, could you identify yourself for the record, please? Yes, Your Honor, Justice. My name is Blake Mishler and I am counsel for the appellant, John Meyer. All right. Thank you. And counsel for the appellee, could you identify yourself, please? Your Honor, it's Tim Cassidy for the appellee, Daniel Meyer. Thank you. Mr. Mishler, you may proceed with your argument. May it please the court, counsel, justices, I am the attorney for the appellant, John Meyer. John Meyer is the son of the decedent, which is Janice Meyer, who passed away August 19, 2022, leaving a will which was entered into probate. That will included a fifth clause, which was meant to pass certain real estate owned by the decedent. It passed the real estate to her children, but included a provision that stated that if a child resided in a residential structure within any of the real estate, that child alone would succeed to ownership of the real estate. It also included an equalization provision to equalize the distributions between the children in the event one of the children were found to reside in one of the residential structures. At the time the will was completed, the decedent owned several parcels of real estate which were to be passed pursuant to the fifth clause of her will. However, at the time that she passed away, she only owned one parcel of real estate passed pursuant to that clause, which is commonly referred to in the litigation as the Route 150 property. Mr. Mishler, could I ask just a preliminary question here, and that relates to what the various beneficiaries knew at the time of the hearing on the petition, I think it's called the Petition for Instructions, relative to real estate owned by the estate, was there any disagreement prior to the hearing that there was only one piece of property, one piece of real estate owned by the estate? I do not know the answer to that question with 100% certainty. I'm not aware of necessarily any dispute that there was before the hearing as to there being any other real estate owned by the decedent. Was there an inventory filed prior to the hearing? Honestly, I do not recall whether an inventory filed either. There was one file, but I don't recall if it was before or after the hearing. All right, because the Petition for Instructions included not just a request to dispose of the Route 150 property, but also talked about potentially equalizing the estate pursuant to the fifth clause, right? Yes, and that was, I think the primary reason for that from the estate was to try to ascertain what exactly that equalization clause meant within the context we were faced. The clear intent of that equalization clause was to try to ensure that there was an equal distribution between the decedent's children, even if one were to reside in any residential real estate. But it was unclear how that equalization would play out, especially given the fact that there was only one parcel of real estate. Well, and to be clear, the fifth clause talked strictly about equalizing real property, not equalizing property, correct? It did specifically talk about equalizing real property, but again, the intent of the provision was to ensure an equalization in the distribution. So it was unclear how that will play out when at the time that was drafted, it was contemplated that there would be an equalization or there were multiple parcels of property when in actuality there was only one parcel of property. Are you suggesting that the fifth clause could be interpreted in any other way other than disposing of the decedent's real property that she owned at the time of her death? I think it was it was unclear to the executor how that clause should be taken because, again, there was only one parcel of real estate, but there was a clear intent on the part of the decedent that an equalization occurred. So whether that was to occur through other assets owned by the estate or it was, you know, there would have to be a different treatment to the real estate that was being used, I believe that was to go to one of the beneficiaries. You know, there was this question of what should happen. And again, I believe the judge, I really did find that there was a question, a legitimate question as to what the estate was to do with regards to this equalization clause. Well, and he reserved ruling on that portion of it, but then ultimately decided that the fifth clause was inapplicable because there was no other real property, right? And that that was the eventual ruling. But the initial finding was that, you know, there was a legitimate question until the final ruling occurred on August 10th, 2023, as to whether or not any further action was needed to be taken by the executor. So that was there any additional evidence provided in the meantime? I don't believe there was additional evidence. But again, that question still remained. And it was the executor and the estate was waiting to hear from the judge on how that clause was to be interpreted. Okay, please go ahead. So the in the instant case, we have a petition that was filed by the executor requested instruction regarding the fifth clause of disease. Well, and specifically how the realist or how the disposition of real estate was to occur in light of the provision of that fifth clause, which stated again, that if a child was residing in a residential real estate, that they will receive that real estate. And in light of this equalization clause, which given the fact that there was only one parcel of real estate, it was unclear how it was to occur whether related to that parcel or other assets in the estate. So in determining the meaning of the decedent's will, the standard would be that the court was required to determine the actual meaning from the plain and ordinary language used in the decedent's will. That's how the court is required to determine. And we are fortunate in this case that there is an Illinois Supreme Court case, which is directly on point, which defines what the term resided in means within the context of a residency requirement. The max in court definition must be applied in this case, because though that case was a statute of construction, statutory constructions have the same standard for construction, which is that the words have to be given their plain and ordinary meaning. There's no reason why the plain and ordinary meaning within the context of this will should be different than the plain and ordinary meaning given within the context of the statute. Additionally, the max in court states very broadly that the definition of residence or resided in which it uses interchangeably is clear within almost every context. So that definition as provided by the court is that we have to look at physical presence and intent to remain to determine whether or not there's a residency established once there's a residency established question. So in this case, there's no question that the appellee resided in the state of Illinois. So the question for the court and for the trial court previously was to determine whether or not the appellee abandoned the residence within the state of Illinois to reside in this case in the state of Alaska. I'm sorry. Go ahead, Justice Harris. OK, I'm sorry for stepping on your toes there. Mr. Meshler, preliminary to addressing the merits of what you're about to discuss, there's been a motion to dismiss filed claiming a lack of jurisdiction. And it asserts that the June 14, 2023 order was final as it relates to the disposition of the Route 150 property. And Rule 304B states that a judgment or order entered in the administration of an estate which finally determines a right of a party is appealable without a special finding. Here, the court's June 14, 2023 order appears to determine with finality of a party's right to the Route 150 property. And why then is that not a final and appealable order such that it then makes the pending appeal, leaving us without jurisdiction to consider the pending appeal based on untimeliness? Yes, Your Honor, I'd like to address that on several points. So this court must deny the motion to dismiss that was filed by the appellee, again, for several reasons. The first is that in Reyes State of Nelson states that it does not determine the right status of a party if it contemplates future action. In this case, the specific order that was entered on June 14, 2023, specifically reserved of the remaining construction of the causation clause, which fell under the same fifth clause of the scene's will. Even if there was to be a subsequent, suppose there was other property for purposes of this clause, how would that impact on the court's decision to provide for the disposition of the Route 150 property? The ownership of that property would be unaffected, according to the fifth clause of the will, by any subsequent equalization. There wouldn't be any diminution in the title of that property. How would that order, the June 14 order, be affected in any way? So I think first off, we're getting a little bit ahead of ourselves in terms of saying, you know, what the equalization clause meant. As judge, I really ruled there was a question asked how the equalization clause should be determined in this case and how it would affect the disposition of the real estate under the fifth clause. And that was not determined until August 10, 2023. So that issue had to be determined to say, you know, what the equalization clause meant or didn't mean. But counsel, excuse me, if I may, and Justice Harris is going along the line of questioning that I had. Equalization is about adjusting ownership or payments or contribution, and the fifth and is not, as you suggest, some overall equalization. So it doesn't impact ownership. And the June 14 disposition determined, despite your arguments, and I understand that you have some with regards to the abandonment of what we want to call residency, but at that point, it determined Daniel resided in the 150 property, and thus he had sole ownership. Nothing in the equalization clause would modify that, correct? And I think a lot of it goes back to what the issue was that was finally determined. You know, what is the issue that needed to be finally determined before the court, this court was granted jurisdiction? What issue was determined then in the June 14 order? From your perspective, what issue did the court rule on in that order? I think that the issue that was dealt with in the June 14 order was specifically related to the real estate he resided in the real estate before the issue became final and appealable. The issue presented before the court, and that needed to be finally determined was the disposition of the of all of the assets under the fifth clause of the proceedings bill. Mr. Mishler, the June 14 order said Daniel gets the Route 150 property. What conceivable future order could have been entered that would impact on that June 14 order that says Daniel gets the Route 150 property? Well, you know, again, the equalization, it was not clear how the equalization clause and the equalization clause fell under the same fifth clause of the decedent's will. The fifth clause of the decedent's will related to the disposition of the real estate solely under that fifth clause. So the only real estate or the only asset disposed of pursuant to the fifth clause of the will was the Route 150 property. And there still was a question as to part of that clause. So, you know, if there wasn't a question, which the court specifically ruled there was a question as to how this equalization clause should apply, you know, it could have chose not to address that. But again, I want to point to the court to in re estate of Debbie, which is a case from this court in which there was a ruling from the trial court that determined that a contract was void and it was appealed. There was no issue that was reserved with regards to the contract. And the court moved to find that it did not have jurisdiction because there was some question or issue as to the disposition of the assets that were in the estate because some assets apparently could have passed under the contract before it was determined to be void. And again, this wasn't a reserve issue. There was no motion to dismiss file. And I think this illustrates how the court must approach the definition of what the issue before the court was. And I think the definition of the issue and the issue addressed by was the disposition of the assets pursuant to the clause. And that remains an open question until the final order was entered on August 10th, 2023. So just as the waiting of the contract did not lead to a final determination of the issue. This court must really draw a broader conclusion as regards to what the actual issue is. And the standard should be that the issue was the disposition of the assets pursuant to the fifth clause. Part of that was whether or not the appellee resided in the residential real estate. And another part of that was the equalization clause. Again, it was unclear how all the layout until August 10. Another point here is that rule 304 B1 as stated in Debbie is meant to avoid, require the finality and judgments to avoid a multiplicity of suits and piecemeal appeals. We adopt the appellee's argument that we should have appealed after June 14th, 2023. That would have required one appeal with regards to the first hearing dealing with the fifth clause. And then after the August 10th, 2023 hearing, a second appeal dealing with that same clause that would cut directly against the entire purpose of rule 304 B1, which is to event that type, prevent that type of situation. So again, the court must look broadly at the fifth clause of the will. The fifth clause had two parts, both of which the estate requested construction and instruction on, and it was not required. There was no jurisdiction in this court until both of those issues were concluded. And I understand there might be some question now as to, you know, what other ruling the court could have made or, you know, what the decision could have been. But the, but the, the important point is that it was unknown that judge, I really specifically said that there was a question of fact, and it wasn't appropriate to move forward with an appeal until we had finality as to that issue. Mr. Messler, a counter argument would be in terms of why it should be immediately appealable is that Daniel could take the property. He could sell it. He could dispose of the proceeds. And then according to your theory, when the equalization portion of this was finally heard, and let's say it was heard, you know, months after, there could be nothing there and wasn't 304B meant to address that situation where, you know, potentially, you know, the property has been disposed of. Let's not let it get to that point. Let's have the issue decided if it's, if it finally disposes of the right of a party, and here it would appear that it did, you can get that heard for on appeal rather than having some irretrievable situation, several months, or potentially even years after. So again, you know, the situation, I think that kind of hits on, again, this court's decision and Stephen B. which was a case in which, you know, the court, this court laid out the standard from 304B1. And that standard is that, you know, part of the standard is that a judgment is final only when the only matter left is the execution of the judgment. And again, you know, I don't think we were to that point where the real estate could have been passed out to the applicant. And that real estate involved the fifth clause of the decedent's will. The fifth clause had both the resided in requirement and the equalization. And if the case was not to the point of being able to execute that judgment until we had a full conclusion of the issue of the disposition of the cedent's assets pursuant to the fifth clause, so I do not believe we were there yet, which rendered the judgment not final until August 10, 2023. I believe I am out of time. If the court would be willing to grant me additional time, I would have to argue the points with regards to the interpretation of the cedent's will and the issues with the court. Mr. Mishler, yes, you are out of time. You'll have time in rebuttal. Mr. Cassidy, you may proceed with your argument. Thank you. If I may please the court, Mr. Mishler, good morning. I represent Dan Meyer, one of the four surviving children of Janice Meyers, whose will is an issue in this case with respect to interpretation. Your Honor, I'd like to answer, if I could, your question regarding whether it was known that there was no other property, and the answer is yes, that was known at the time of the death and the filing. In fact, the petition for instructions filed by the executor at paragraph nine appears that at the time of the cedent's death, she no longer owned the parcels of real estate listed in the fourth clause of the will, nor did she own any parcels listed in paragraph one or two of the fifth clause. So, it was known that the district, the Route 150 property was the only property owned by the cedent at the time of her death. Obviously, in this case, the petition for instructions was asking for the court to instruct the executor first how to dispose of the Route 150 property pursuant to the intent of Janice Meyers, the mother. And secondly, once that issue is determined, how should the equalization of distribution clause work? And again, I'll actually point to the petition for instructions filed by the executor in the prayer for relief at paragraph three of the prayer for relief. It says, if, and I underscore if, the court determines that the petitioner should distribute the Route 150 parcel solely to Daniel, that the court should instruct the petitioner as to what actions, if any, he should take regarding the equalization of distribution. A predicate to the second issue of equalization of distribution was a final determination of the rights of the parties, that being my client and his two brothers and sisters regarding the ownership of the Route 150 property. That falls squarely within rule 304B1, that the June 14 order did finally determine the rights of the parties with respect to ownership of that property, which was a predicate to the second issue that was ultimately decided in August. Now, this question, and I'm talking about jurisdiction, Your Honor, about multiple appeals that, as you allude to, the June 14 order should have been appealed within 30 days, just as a matter of law, because it finally determined the rights of the party, but also as a matter of judicial economy, because if that was going to appeal, which eventually was, albeit untimely, the trial court couldn't decide the equalization of distribution issue until they had any appeal on the initial question was decided, whether the property goes solely to Daniel, what happens on equalization, and if it doesn't go to Daniel, you don't even get to the equalization of distribution clause. On the other hand, there are— Mr. Cassidy, I don't understand why the trial court reserved this issue of equalization. Well, I was—it was a timing issue. We had a half a day to try the case, and the court ruled it was an evidentiary hearing. The trial court ruled, and because of his calendar, he didn't have time to get to the second issue, so he said he would reserve it. I mean, that's—I could just tell you that, but that's not on the record. And then, unfortunately, the trial judge, Judge Farabacher, within two days after this bench trial, became ill and never returned to the bench. That's how Judge Iruli got involved. So I can understand why you don't understand. It was a very unusual situation as far as the presiding judge was—trial judge was concerned. Judge, I'd just like to get into the merits— Excuse me, counsel. In light of that, I guess the question I have is, does that reservation of the equalization issue being from the same hearing change the finality of the order? And what authority would suggest the court's actions could then excuse the party from having to appeal within 30 days? Well, first of all, I don't think—the finality of the order has to do with the determination—finally determine the right or status of a party, which was done. And the trial court—and with all due respect, I don't believe this court has any discretion to excuse the jurisdictional issue and allow them to go beyond 30 days. That issue was decided. There's no question. And it's telling, I think, too, that the only thing on appeal here is the June 15 order. Which is brought under 304B1. On the merits, I would just like to point out—and I know the court's familiar with the briefs in this matter—is the appellant focuses solely on this issue of legal residency in Kenai, Alaska, that my client secured for a property tax exemption and a permanent dividend fund under the administrative laws, the statutory laws of the state of Alaska. The objective here is to interpret the intent of Mom, Janice Myers, when she said, I want to give my residential property to any child residing therein. It doesn't say that I'm only giving—I want to give my residential property only if one of my children is no longer a resident—a legal resident of the state of Illinois and a resident of some other state, Alaska or any other state. That's a red herring, I believe. I mean, the facts of this case—I mean, there's not even any suggestion or evidence that Janice Myers knew what the statutory legal requirements of residency were in Alaska. And all the appellant talks about is—they don't get into the facts of whether my client was residing in the Route 150 property. They talk about legal residency of Alaska and abandoning legal residency of Illinois, neither of which could be determinative of Janice Myers' intent. You know, my client and his wife, Mary, started—began living in this property in 1980. And they rented it from their mom and dad. And up until the time of Janice Myers' death in August of 22, they had lived in that property for 42 years. They raised four daughters there. Their four daughters at the time of trial and presently live within a 10-mile radius of the Route 150 property. There's no question that Mary Meyer, Dan's spouse, lives there year-round. Beginning in 2016, my client began splitting his time between the Alaska cabin and the Route 150 property in Peorio. All his furniture is in Peorio at the Route 150 property. His personal belongings are at the Route 150 property. His clothes, shoes, hats are at the Route 150 property. He paid rent up until the time of his mother's death at the Route 150 property, pays the utilities, made all the improvements, including major improvements, new roof, fence, carpeting and gutters, what have you. His doctors, eye doctor, dentist, medical doctor are in Peorio. In fact, it's undisputed that in 2022, the year of his mother's death, he was in Peorio for at least 88 days, which is 25% of the time. His mother knew that he had this second home, I would say, or cabin in Alaska. In fact, she wanted to visit there. She couldn't because of her physical condition. She never objected to it. She knew her daughter-in-law continued to be at the Route 150 property year-round. She knew that her grandchildren and great-grandchildren visited there regularly. So under that factual scenario, what is residing in? It's not a statutory definition of legal residency of Alaska. As far as the intent of Janice Meyer is concerned, is one of her children and her family living at this property, I wanted to go to them. Look at intent conversely, would it be her intent that that portion of the will be deemed that he didn't reside in it and that Dan and his wife, her daughter-in-law be kicked out of that property, which was the Dan Meyer family home, and that it be sold and go into the residue of the estate? I think not under the facts of this case, which are all undisputed. None of these facts are disputed. Now, the will had to be interpreted by the trial court based upon an evidentiary hearing because of the circumstances of whether factually Dan was residing or living in that property. And the court found that he was. And there was some difference of opinion regarding the standard of review of this court. And the appellant urges that it's a de novo. Well, it's only de novo if this was just an interpretation of the plain meaning of the will, similar to contract construction. And this clause in the will was interpreted after parole evidence in an evidentiary hearing with factual findings by the trial court. And that's a manifest weight standard, your honors. And I think that that's how the standard review should be applied in this case. In fact, I think there's no question that if this court decides that there's jurisdiction, that the manifest weight of the evidence needs to be looked at. I want to briefly talk about Meissen, the Supreme Court decision. And that is not outcome determinative. The appellant seems to suggest that I agreed that Meissen at the trial court was outcome determinative. And that's simply not true. This essentially, with respect to the appellate courts in the Illinois Supreme Court, is a somewhat of a question, a first impression as to the meaning of the phrase residing in. Under the context of a person's will, as opposed to the context of whether a candidate for political office is a resident of an electoral district, whether you have a right to vote in a certain precinct or district, which are all statutory or municipal definitions. And that's what Meissen was doing. The court in Meissen was doing was recognizing the standards of what a residence is in the context of statutory definitions for residencies for political office or voting rights. And when the court there said there's been 100 years of precedent on that issue, it was talking about the legal requirements for electoral purposes, which has nothing to do with this when you're talking about the intent of Janice Meyer in that clause. Now, what I said at the trial court, and I maintain now because of this being a question of first impression, is that Meissen could provide the court with a roadmap, you know, with guardrails, if you will, as far as the general standards or procedures. And counsel started to address that, is that once residency is established, which in this case, there's no factual dispute that it was at least between 1980, beginning in 1980 to 2016, then the issue becomes abandonment. And abandonment is a question of intent. And there's no issue here that Dan Meyer ever abandoned the Route 150 property as the Meyer family home. I mean, not only, I mean, he was physically present there, not to mention all of his personal properties and things that I just discussed. And furthermore, the question of abandonment, you know, only the burden of proof is on the appellant, in this case, the person challenging residing in, to show that there has been abandonment. And even under the confines of the general principles stated by the Supreme Court of and the trial court found that there's no abandonment. That was one of the trial court's factual findings, that there was no abandonment here under these undisputed facts. And the trial court found that it cannot be Janice Meyer's intent under the terms of her will and the undisputed facts in this case, that she would want to see her son, Dan Meyer, and her daughter-in-law thrown, essentially thrown out of this house and have it sold. And so I think that with that, your honors, regardless of if it's a de novo review or manifest way to the evidence review, the trial courts should, should be affirmed, assuming that the court finds that the jurisdiction, which as you know, my client believes that there's not. Thank you. All right. Thank you, Mr. Cassidy. Mr. Mishler, rebuttal argument. I just want to go back to this jurisdictional argument and how to frame the understanding of whether or not there was a final determination, the issue presented before the court. So the case law is very clear that you have to resolve all matters on a particular issue. And again, I think that in Ray's state of Debbie is very instructive on that point and how this court should look at whether or not the entire issue was resolved, whether the issue should be specifically limited to just the determination that resided in this particular real estate, or whether a broader view of issue should be the application of section five of O.C.'s will as a quote. The petition for instruction only request instruction under the fifth clause of the decedent's will as has been outlined here. The only real estate that are the only asset and the only real estate that was passed pursuant to that fifth clause was this route 150 property. We had two questions with regards to how that property should be dealt with. One was an interpretation of how resided in should be dealt with. The other was this equalization clause. So the issue was the disposition of the real estate, the route 150 property pursuant to the fifth clause of the decedent's will and whether or not it was likely that one outcome was to occur or not in the second hearing, which occurred on August 10th, 2023 is not the question. The question is, was there an outstanding issue that had yet to be determined? And again, after the June 14th, 2023 order, that court specifically resolved or reserved an issue with regards to the fifth clause of the decedent's will. That issue was not resolved until August 10th, 2023, at which there was a final determination of how the decedent's asset should be passed pursuant to the will under that fifth clause. We didn't know how the fifth clause was to be looked at until August 10th, 2023, at which point jurisdiction was granted in this court and we properly filed our notice of appeal. So again, going back to Ingres' statement, Nelson, he says. Can I just interrupt one moment, please? Just to make sure I'm clear in looking at, and I know we've referenced the June, excuse me, he did not hear the hearing. A different judge heard the matter on June 8th. In that transcript, that judge did not reserve any additional findings. Is that correct? There's nothing in the record here to indicate that reservation. It was just when another judge takes up the case because of the trial judge's illness that that gets included in the order. Is that accurate? I think it was a, it came from the parties who both understood that this secondary issue under the fifth clause was not reserved. And it might not have been specifically reserved, but at the same time, the court did not address it. So it had not been addressed. So they needed a secondary hearing and the order entered by a judge, I believe, reflects that. So again, Ingres' statement, Nelson says that if there's an order that contemplates future action, we do have, in this case, an order that contemplates future action in this case. As a result, it was not final and appealable. And again, going back to Ingres' State of Debit, that case determined finally that a contract was forwarded, but still found that the court did not have jurisdiction because all matters related to the disposition of the decedent's assets had not been determined. Similarly, in this case, there hadn't been a full determination of how the assets were to be distributed pursuant to this fifth clause. And thus, there was not jurisdiction in this court. And then again, getting back to the piecemeal appeals, I mean, we had one petition for instruction. We were only referring to a single clause of the decedent's will in that single petition for instruction. It makes no sense for a judicial economy to break up into multiple appeals that single clause of the appeal. So, that's the entire purpose of Rule 304. And I also want to touch on the actual construction of the will and the standards to be applied. The other side says that Maxson is only a guidepost. Maxson is not a guidepost. Maxson outlines the definition of residence and resided in as adopted by the Illinois Supreme Court. That must be applied in this case, not as a guidepost, but as the actual definition, because that statutory definition applies the same standard giving words that are plain and ordinary meaning that we have to apply in this case. We're not to guess at what the decedent might have wanted to happen. As the other side suggests, we are only to look at the words of the decedent and to determine intent from the plain and ordinary meaning of those words. Maxson has a very clear definition of what it is to reside somewhere. The question in this case is abandonment. Again, abandonment, as applied by the other side, is complete abandonment. They have to have completely moved out of the state of Illinois before abandonment occurred. This is not the standard that's outlined in Maxson. Maxson refers to be quick for the proposition that residence is abandoned when one takes up residence in a new location. So an important point to that that the other side misses is that one may only have one residence. Mr. Mishler, you are out of time. I'm sorry. Counsel, thank you both for very good arguments. The case will be taken under advisement and we will issue a written decision.